886 F.2d 1325
 281 U.S.App.D.C. 25, 105 P.U.R.4th 437
 PUBLIC UTILITY COMMISSION OF TEXAS, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
The Utilities Telecommunications Council, United States
Telephone Association, Contel Corporation, Atlantic
Richfield Company, Ameritech Operating Companies, et al.,
GTE Southwest Incorporated, The People of the State of
California, et al., The Organization for the Protection and
Advancement of Small Telephone Companies, The Independent
Coalition, The Association of American Railroads,
Southwestern Bell Telephone Company, The Ad Hoc
Telecommunications Users Committee, The Mountain States
Telephone and Telegraph Company, International Business
Machines Corporation, Intervenors.
No. 88-1274, et al.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued May 5, 1989.
Decided Sept. 22, 1989.
As Amended Oct. 4, 1989.
 
 Steven Baron and James R. Hobson, with whom Paul Rodgers, Charles D. Gray, Washington, D.C., and William Malone were on the joint brief, for petitioners in Nos. 88-1274, 88-1287 and 88-1294.
 Lisa M. Zaina also entered an appearance for petitioners in 88-1287 for intervenor Nat. Ass'n of Regulatory Com'n in Nos. 88-1274 and 88-1294.
 Paul Rodgers and Charles D. Gray, Washington, D.C., also entered appearances for intervenor Nat. Ass'n of Regulatory Com'n in Nos. 88-1274 and 88-1294.
 John E. Ingle, Deputy Associate Gen. Counsel, F.C.C., with whom Diane S. Killory, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, and Linda L. Oliver, Counsel, F.C.C., Washington, D.C., were on the joint brief for respondents in Nos. 88-1274, 88-1287 and 88-1294.
 Catherine G. O'Sullivan and Andrea Limmer, Attys., Dept. of Justice, Washington, D.C., were on the brief for respondents in Nos. 88-1274, 88-1287 and 88-1294.
 Marion L. Jetton, Atty., Dept. of Justice, Washington, D.C., also entered an appearance for respondents in Nos. 88-1274, 88-1287 and 88-1294.
 Richard Kennon Willard, with whom Philip Malet, Washington, D.C., was on the brief, for intervenor Atlantic Richfield Co. in Nos. 88-1274, 88-1287 and 88-1294.
 Tyrone Brown also entered an appearance for intervenor Atlantic Richfield Co. in Nos. 88-1287 and 88-1294.
 E. William Henry, Rodney L. Joyce, Edwin N. Lavergne, and Frederick M. Joyce, Washington, D.C., were on the brief for intervenor Southern New England Telephone Co., et al. in Nos. 88-1274, 88-1287 and 88-1294.
 Harvey J. Shulman, Washington, D.C., also entered an appearance for intervenor Southern New England Telephone Co., et al. in Nos. 88-1274, 88-1287 and 88-1294.
 Charles M. Meehan, Shirley S. Fujimoto, Wayne V. Black and G. William Frick, Washington, D.C., were on the joint brief for intervenors-respondents, Utilities Telecommunications Council, American Petroleum Institute and Ass'n of American Railroads in Nos. 88-1274, 88-1287 and 88-1294.
 Hollis G. Duensing, John T. Sullivan, George Petrutsas, Leonard R. Raish, Washington, D.C., and Barry Lambergman also entered appearances for intervenor Ass'n of American Railroads in No. 88-1274.
 C. Douglas Jarrett, Washington, D.C., also entered an appearance for intervenor American Petroleum Institute in Nos. 88-1274, 88-1287 and 88-1294.
 Janice E. Kerr, J. Calvin Simpson, San Francisco, Cal., and Ellen S. LeVine were on the brief for intervenor The People of the State of Cal., et al. in Nos. 88-1274, 88-1287 and 88-1294.
 Martin T. McCue, Roselle, Ill., entered an appearance for intervenor U.S. Telephone Ass'n in Nos. 88-1274, 88-1287 and 88-1294.
 John C. Wohlstetter entered an appearance for intervenor Contel Corp. in Nos. 88-1274 and 88-1294.
 Alfred Winchell Whittaker, Richmond, Va., Floyd S. Keene, Milwaukee, Wis., and Michael J. Karson entered appearances for intervenor Ameritech Operating Companies, et al. in Nos. 88-1274 and 88-1287.
 James R. Hobson also entered an appearance for intervenor GTE Southwest Inc. in Nos. 88-1274 and 88-1287.
 Ellen S. Deutsch, Washington, D.C., entered an appearance for intervenor Independent Coalition in Nos. 88-1274 and 88-1287.
 Andrew G. Mulitz, Washington, D.C., entered an appearance for intervenor Organization for Protection and Advancement of Small Telephone Companies in Nos. 88-1274, 88-1287 and 88-1294.
 William C. Sullivan, Michael J. Zpevak, Dan T. Foley and Liam S. Coonan, St. Louis, Mo., entered appearances for intervenor Southwestern Bell Telephone Co. in Nos. 88-1274, 88-1287 and 88-1294.
 James S. Blaszak, Charles C. Hunter and Laura C. Mow, Washington, D.C., entered appearances for intervenor Ad Hoc Tele communicationsUsers Committee in Nos. 88-1274, 88-1287 and 88-1294.
 Dana A. Rasmussen and Robert B. McKenna, Denver, Colo., entered appearances for intervenor Mountain States Tele. and Tele. Co., et al. in Nos. 88-1274, 88-1287 and 88-1294.
 Howard C. Davenport, Mary J. Sisak, Charles A. Tievsky and Peter G. Wolfe entered appearances for intervenor Public Service Com'n of the District of Columbia in No. 88-1274.
 John F. Povilaitis, Harrisburg, Pa., Daniel P. Delaney and Lawrence F. Barth, Halifax, Pa., entered appearances for intervenor Pennsylvania Public Utility Com'n in Nos. 88-1274, 88-1287 and 88-1294.
 J. Roger Wollenberg, Roger M. Witten, Washington, D.C., and Kevin H. Cassidy, Purchase, N.Y., entered appearances for intervenor International Business Machines Corp. in Nos. 88-1274, 88-1287 and 88-1294.
 Saul Fisher, Bedminster, N.J., Mary McDermott and Martin J. Silverman entered appearances for intervenor New York Telephone Co., et al. in No. 88-1274.
 James R. Young and Lawrence W. Katz entered appearances for intervenor Bell Atlantic Telephone Companies in Nos. 88-1274, 88-1287 and 88-1294.
 Lawrence G. Malone, Albany, N.Y., entered an appearance for intervenor New York Public Service Com'n in No. 88-1287.
 Joseph G. Donahue, Portland, Me., Peter G. Ballou, Mitchell M. Tannenbaum, Augusta, Me., and Joel B. Shifman, Charleston, W.Va., entered appearances for intervenor Maine Public Utilities Com'n in No. 88-1287.
 Donald I. Howell and Marsha H. Smith, Boise, Idaho, entered appearances for intervenor Idaho Public Utilities Com'n in Nos. 88-1287 and 88-1294.
 Gregory John Krasovsky entered an appearance for intervenor Florida Public Service Com'n in No. 88-1287.
 Frank J. Kelley, Detroit, Mich., Louis J. Caruso, Don L. Keskey, Lansing, Mich., Ronald D. Eastman, Washington, D.C., and Lynda S. Mounts entered appearances for intervenor State of Mich. and the Michigan Public Service Com'n in Nos. 88-1287 and 88-1294.
 Steven Baron also entered an appearance for intervenor Public Utility Com'n of Texas in No. 88-1287.
 Before ROBINSON, EDWARDS and SILBERMAN, Circuit Judges.
 Opinion for the Court filed by Circuit Judge SILBERMAN.
 SILBERMAN, Circuit Judge:
 
 
 1
 Petitioners seek review of a Federal Communications Commission order pre-empting an order of the Public Utility Commission of Texas ("Texas PUC") that, in turn, prohibited the Southwestern Bell Telephone Company ("Southwestern") from providing the Atlantic Richfield Company ("ARCO") with additional interconnections to the public switched telephone network in Dallas, Texas. Petitioners argue that the FCC's pre-emption of the Texas PUC's order exceeds the authority delegated to the FCC under the Communications Act of 1934, as amended.[1] Petitioners further contend that the FCC's order arbitrarily departed from Commission precedent and unreasonably held that the Texas PUC's order violated ARCO's federal right of interconnection with the public network. We conclude that the FCC permissibly pre-empted the Texas PUC's order and that the Commission was neither arbitrary nor capricious in reaching its decision. Accordingly, we deny the petition for review.
 
 I.
 
 2
 ARCO's Texas headquarters are in Dallas, and it maintains a research complex in Plano, a Dallas suburb, 19 miles away. Southwestern, a Basic Operating Company ("BOC") formerly part of the Bell System, is the state-certificated telephone monopoly for the area that includes Dallas. GTE Southwest (formerly the independent General Telephone Company), a wholly-owned subsidiary of GTE Corporation, enjoys a similarly exclusive state franchise for the area that includes Plano.
 
 
 3
 ARCO operates a private FCC-licensed microwave communications network, ARCOnet, that transmits voice and data among ARCO's offices throughout the United States. Both ARCO's facilities in Dallas and Plano are connected to ARCOnet. ARCO's telecommunications to or from locations not served directly by ARCOnet must, as is true of any other private network, be routed through the public network which interconnects locations in the United States. Customers like ARCO gain access to the public network by obtaining trunk lines from a telephone company which typically interconnect a customer's private branch exchange[2] ("PBX") switchboard to the local office of the telephone company.
 
 
 4
 Prior to 1983, ARCO leased trunk lines connecting its Dallas PBX from Southwestern and trunk lines connecting its Plano lab from GTE. But because of ARCOnet, it was possible for ARCO to route a call through its microwave network from the Plano lab to the Dallas PBX and thereafter to the public network through Southwestern's facilities--thereby entirely bypassing GTE. The trunk lines ARCO used in both locations were primarily Direct Inward Dialing ("DID") trunks[3] available to customers with PBXs. When provided with DID trunks, a customer is also given a corresponding set of DID telephone numbers which the customer is free to assign to telephone stations "behind" its PBX in any way it chooses. Thus, ARCO could have assigned (the record does not show whether it did) a certain number of DID numbers provided by Southwestern to Plano stations which could then be connected to ARCO's Dallas PBX through ARCOnet.
 
 
 5
 In 1983 ARCO, dissatisfied with the quality and reliability of GTE's service, notified GTE that ARCO would no longer need 73 trunks (and their 1,600 corresponding DID numbers) provided by GTE because it did not wish to use GTE's facilities to transmit calls from the Plano lab to points off ARCOnet beyond Plano. ARCO did, however, maintain enough trunks from GTE so that all calls from its Plano lab station to other Plano locations (and vice versa) would be carried on GTE's facilities. To replace the cancelled GTE trunks, ARCO ordered 81 additional trunks and 2,000 DID numbers from Southwestern in Dallas. Many of these numbers were assigned to the Plano lab.
 
 
 6
 Complaining that ARCO was one of GTE's largest customers, GTE asked the Texas PUC to order Southwestern to cease and desist from providing the "additional" interconnections to ARCO. A hearing examiner, after taking evidence, recommended that the Texas PUC deny GTE's request since Southwestern was not--by merely providing the additional interconnections in Dallas--violating Texas law by providing service outside its franchise service area. Moreover, the examiner noted that ARCO had a federal right to use its own facilities in ways that are "privately beneficial without being publicly detrimental" and went on to determine that "[a]ny temporary shortfall of revenues to [GTE] prior to its next rate case is not equivalent to public detriment...." Examiner's Report, Pub. Util. Comm'n of Texas, Application of General Tel. Co. of the Southwest for a Cease and Desist Order Against Southwestern Bell Tel. Co. ("Examiner's Report") 18, 20 (No. 5264) (1985).
 
 
 7
 The Texas PUC rejected the hearing examiner's recommendation by a 2-1 vote and determined, instead, that when Southwestern supplied ARCO with the trunks and DID numbers in controversy, it thereby provided ARCO's Plano facility with service in violation of section 50 of the Texas Public Utility Regulatory Act, Tex.Rev.Civ.Stat.Ann. art. 1446c, Sec. 50 (Vernon 1980 & Supp.1989), which prohibits uncertificated public utilities from serving, directly or indirectly, a consuming facility within an area being served lawfully by another public utility. The Texas PUC also believed that granting GTE's application for a cease and desist order against Southwestern was consistent with applicable federal law, stating that "[w]hile the service arrangement between [Southwestern] and ARCO is privately beneficial, there is significant public detriment which would follow from the interconnection," including difficulties in system planning, the prospect of stranded investment, and disruption of the local exchange network design process. See Order, Pub. Util. Comm'n of Texas, Application of General Tel. Co. of the Southwest for a Cease and Desist Order against Southwestern Bell Tel. Co. ("Texas PUC Order") 2 (No. 5264) (1985). Without any attempt to distinguish ARCO's intrastate from its interstate calls, the Texas PUC ordered Southwestern to remove the "additional" (i.e., those added in 1983) trunks it supplied to ARCO in Dallas within six months of the date of the Texas PUC's order. See id. at 6.
 
 
 8
 ARCO then petitioned the FCC to order Southwestern to continue providing the additional service to ARCO in Dallas and requesting that the FCC declare unlawful and invalid the Texas PUC's order. The FCC Common Carrier Bureau granted ARCO's petition. See In re Atlantic Richfield Co., Memorandum Opinion and Order, Chief, Common Carrier Bureau (FCC Mimeo No. 1115) (released Nov. 27, 1985). The Bureau first found that Southwestern was not encroaching on GTE's franchised service area. See id. at 8. Rather, it stated, ARCO had merely exercised its option to utilize its private microwave system in conjunction with Southwestern's certificated authority to provide interconnection to Dallas facilities. The Bureau then concluded that the Texas PUC's order was invalid, stating that the order "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of federal interstate communications policies...." Id. at 11.
 
 
 9
 On GTE's application to the FCC for reconsideration, the Commission affirmed the decision of its Common Carrier Bureau. See In re Atlantic Richfield Co., Memorandum Opinion and Order ("Memorandum Opinion and Order"), 3 F.C.C. Rcd 3089 (1988). In its order, the FCC asserted the primacy over conflicting state regulations of a customer's federal right to interconnect its facilities with the public telephone network in ways that are privately beneficial and not publicly detrimental. See id. at 3091. The FCC further concluded that Texas's interest in regulating local exchange boundaries did not bar the FCC from pre-empting the Texas PUC's order. See id. at 3092.
 
 II.
 
 10
 The Communications Act attempts to divide the world of telephone regulation neatly into two separate components. Under section 1 of the Act, 47 U.S.C. Sec. 151, the FCC is empowered to regulate "interstate and foreign commerce in wire and radio communication," while section 2(b), 47 U.S.C. Sec. 152(b), preserves the states' power to regulate "intrastate communication service." In reality, since most aspects of the communications field have overlapping interstate and intrastate components, these two sections do not create a simple division; rather, they create a persistent jurisdictional tension.
 
 
 11
 As the Texas PUC sees the case, the FCC's order interfered with Texas's right to establish carrier franchise boundaries within Texas, which it has a right to do incident to its acknowledged authority to regulate "telephone exchange service," "a statutory term of art ... mean[ing] service within a discrete local exchange system." North Carolina Utils. Comm'n v. FCC ("NCUC II"), 552 F.2d 1036, 1045 (4th Cir.) (citing 47 U.S.C. Sec. 153(r)) (emphasis added), cert. denied, 434 U.S. 874, 98 S.Ct. 222, 54 L.Ed.2d 154 (1977). It is particularly troubled that companies like ARCO with private microwave capacity connecting various locations within Texas will be able to choose their points of access to the public switched network and, by so doing, introduce undesirable competition among monopoly franchises. ARCO's federal right under the Communications Act to access to the public switched network was and is satisfied so long as GTE "reasonably" provided that service to ARCO's Plano lab. When ARCO was dissatisfied with GTE's provision of services in Plano, it should have complained to the Texas PUC which has authority, under the Texas Public Utility Regulatory Act, to ensure adequate service. See Tex.Rev.Civ.Stat.Ann. art. 1446c, Secs. 37, 58(a) (Vernon 1980 & Supp.1989). The approach ARCO chose and that the FCC sanctioned, according to the Texas PUC, risks stranded investments and perhaps an increase of telephone rates for those who do not have flexibility, by virtue of a private microwave network, to choose their points of access to the public switched network.
 
 
 12
 The FCC, on the other hand, views ARCO's private interstate microwave system, which is federally licensed, as akin to a piece of telephone equipment that, under Hush-A-Phone Corp. v. United States, 238 F.2d 266, 269 (D.C.Cir.1956), ARCO has a right to use as it pleases so long as its private benefit is not outweighed by a public detriment. And that standard is a federal one that section 1 of the Act grants the FCC--not Texas--the final authority to apply. Accordingly, the FCC asserts that any owner of a private microwave communication system has a federal right (subject to the federal private benefit-public detriment test) to choose its points of access to the public switched network without any interference from state regulators, who have regulatory jurisdiction over the telephone companies providing access service. Since the Texas PUC interfered with this asserted federal right, the FCC's pre-emption order was within its statutory authority.
 
 
 13
 In Hush-A-Phone we held that the FCC was not authorized to approve, as just and reasonable within the meaning of section 201(b) of the Act, a telephone company tariff that prevented a telephone subscriber from attaching a cup-like device--not purchased from the telephone company--to his telephone in order to confine his voice. That early case did not involve a question of conflicting state and federal regulatory interests, but the FCC has adopted our formulation of the customer's right reasonably to use his telephone equipment as a federal right against intruding state regulation whenever the customer uses his equipment in ways that are privately beneficial without being publicly detrimental. Thus, the Commission in Heritage Village applied that standard to pre-empt a South Carolina PUC order prohibiting Southern Bell from providing service to a customer whose buildings straddled the border of North Carolina and South Carolina. See Heritage Village Church and Missionary Fellowship, Inc., 88 F.C.C.2d 1436 (1982), aff'd sub nom. Fort Mill Tel. Co. v. FCC, 719 F.2d 89 (4th Cir.1983). The certificated carrier for the portion of South Carolina that the customer's premises overlapped, Fort Mill, was, like GTE here, an independent telephone company, whereas Southern Bell enjoyed the franchise in the relevant North Carolina area.[4] The customer (Heritage) provided the PBX, the individual stations, and the connecting wiring and, although the stations were in South Carolina, the customer chose to place the PBX in North Carolina and order service from Southern Bell. The FCC's order was affirmed by the Fourth Circuit as a permissible exercise of its pre-emptive authority, and the Commission relied on that authority in its order here.
 
 
 14
 Of course, the stakes are much greater in the case before us, as is clear from the number of intervenors. Scores of companies, particularly, as the FCC noted, transportation and public utility companies, have extensive private microwave networks and wish the freedom to reconfigure their connections to the public switched network without wrestling with state regulatory authorities. See Memorandum Opinion and Order, 3 F.C.C. Rcd at 3092. The states, on the other hand, are apprehensive as to the "bypass" implications of that freedom.
 
 
 15
 For purposes of our pre-emption analysis, we assume that the FCC's elaboration of Hush-A-Phone to create a right on the part of a customer to use its own equipment in connection with wholly inter-state carriage is securely within the FCC's authority. Indeed, that proposition is not squarely challenged by petitioners. We think it appropriate to assume further, therefore, that if all communications to be serviced by Southwestern's "additional" lines were interstate in character, Texas would have no claim to exercise regulatory authority over their provision[5] and, to reverse the assumption, if all the calls ARCO were to make through the "additional" lines were intra state, the FCC would be barred by section 2(b) of the Act from pre-empting the Texas PUC's order. But neither is the case; the trunks in question are to be used to transmit both interstate and intrastate calls--at least that is the assumption upon which both the Texas PUC and the FCC proceeded. As such, we must once again explore the contours of the FCC's authority to pre-empt state regulation based on the inseparability doctrine recognized by the Supreme Court in Louisiana Pub. Serv. Comm'n v. FCC, 476 U.S. 355, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986), decided after Heritage Village.
 
 
 16
 In Louisiana, the Court disapproved the FCC's attempt to pre-empt states from applying their own depreciation rules in setting intrastate rates, despite the FCC's claim that such state rules impermissibly frustrated the federal policy served by its own depreciation rules. The Court rejected both the FCC's construction of section 1 of the Communications Act as permitting pre-emption of any state regulation encroaching on interstate communication, as well as its reading of section 2(b) of the Act as barring FCC action only when the matter to be regulated is purely local and where the state regulation to be pre-empted does not affect interstate communication. Rather, the Court held that section 2(b) severely circumscribes the FCC's power by "fenc[ing] off from FCC reach or regulation intrastate matters--indeed, including matters 'in connection with' intrastate service." 476 U.S. at 370, 106 S.Ct. at 1899.[6] Noting that "it is certainly possible," albeit perhaps inconvenient, for both interstate and intrastate depreciation rules to coexist, see id. at 375, 106 S.Ct. at 1902, the Court invalidated the FCC's pre-emption order, see id. at 379, 106 S.Ct. at 1904. The Louisiana Court implicitly recognized, however, that the FCC may regulate the subject matter and, if necessary, pre-empt conflicting state rules where the FCC cannot "separate the interstate and the intrastate components of [its] asserted ... regulation." Id. at 375 n. 4, 106 S.Ct. at 1904 n. 4.
 
 
 17
 As examples of situations in which such separation is impossible, the Court in Louisiana cited two Fourth Circuit cases: North Carolina Utils. Comm'n v. FCC ("NCUC II"), 552 F.2d 1036 (4th Cir.), cert. denied, 434 U.S. 874, 98 S.Ct. 222, 54 L.Ed.2d 154 (1977) and North Carolina Utils. Comm'n v. FCC ("NCUC I"), 537 F.2d 787 (4th Cir.), cert. denied, 429 U.S. 1027, 97 S.Ct. 652, 50 L.Ed.2d 631 (1976). In the NCUC cases, the FCC, as part of its policy of allowing customers to supply their own telephones, pre-empted state regulations that prohibited customers from connecting their own phones to any telephone facilities used for intrastate calling. This pre-emption order was upheld by the Fourth Circuit (and implicitly approved by the Supreme Court in Louisiana ) because limiting telephones either to interstate or to intrastate use was a "practical and economic impossibility." NCUC II, 552 F.2d at 1043. As a result, the Fourth Circuit found that allowing states to prohibit interconnection of telephones unless used solely for interstate calling would render "federal tariffs authorizing interconnection ... nugatory." Id.
 
 
 18
 Since Louisiana, this Circuit has had two opportunities to examine FCC claims of inseparability. In National Ass'n of Reg. Util. Comm'rs v. FCC ("NARUC"), 880 F.2d 422 (D.C.Cir.1989), we reviewed FCC orders preventing state utility commissioners from regulating--in any way--the installation and maintenance of the "inside wiring" within customers' premises. See id. 880 F.2d at 427. According to the FCC, because the wires themselves could not be separated into intrastate and interstate components, pursuing the asserted federal policy of promoting a competitive, deregulated market for inside wiring could not coexist with state regulations unless customers were forced to buy two sets of inside wiring, one for interstate and the other for intrastate use. See id. 880 F.2d at 429.[7] In NARUC, we rejected the FCC's contention that whenever facilities are physically inseparable into intrastate and interstate components the Commission is empowered to pre-empt state regulation of those facilities. See id. 880 F.2d at 430-31. Instead, we held that the FCC may pre-empt state regulation only "when the state's exercise of [its] authority negates the exercise by the FCC of its own lawful authority over interstate communication," id. 880 F.2d at 429, and we accepted the states' argument that the two regimes could coexist if the states merely "unbundled" the charges for inside wiring from those for basic transmission service, thereby leaving customers free to seek an alternative provider of inside wiring. See id. 880 F.2d at 429-31. The FCC's pre-emption order was remanded in part because the FCC failed to satisfy its burden of showing that, once the "unbundling" were ordered, the state regulations it sought to pre-empt would in fact "necessarily thwart [the FCC's legitimate objective] ... of a free and competitive inside wiring market." Id. 880 F.2d at 431.
 
 
 19
 We applied the same analysis to an FCC pre-emption order in Illinois Bell Tel. Co. v. FCC, 883 F.2d 104 (D.C.Cir.1989), but found there that the FCC adequately explained why its regulation in that case was inseparable. In Illinois Bell, an association of five Bell Operating Companies created by the break-up of AT & T challenged the FCC's power to pre-empt state regulation of the marketing of certain services that they described as purely intrastate, such as Centrex.[8] In their view, because the FCC's pre-emption order would inevitably affect charges for intrastate communications services, the Commission exceeded its jurisdiction under section 2(b). We rejected the petitioners' characterization of Centrex as purely intrastate, accepting the FCC's finding that " 'Centrex supports both interstate and intrastate communications.' " Id. 883 F.2d at 114 (quoting Furnishing of Customer Premises Equip. by the Bell Operating Tel. Cos. and the Indep. Tel. Cos., 2 F.C.C. Rcd 143, 160 (1987)). In doing so, however, we noted that FCC pre-emption could not be justified merely by the dual intrastate and interstate aspects of Centrex; the FCC had to show that it could not separate the interstate and intrastate components of its regulation. See id. 883 F.2d at 114-15. We agreed with the FCC's finding that its regulations could not practically be severed into discrete interstate and intrastate components "for federal regulation of the manner in which the interstate aspects of Centrex are marketed jointly with [customer premises equipment--("CPE") ] cannot exist simultaneously with state regulation of the joint marketing of CPE and the intrastate component of Centrex." Id. 883 F.2d at 116 (emphasis in original).
 
 
 20
 NARUC and Illinois Bell make clear that, even when the equipment that the FCC wishes to regulate is used inseparably and interchangeably for intrastate and interstate calling, the FCC must limit its regulation to the interstate aspects if it can do so. In this case, therefore, the inseparability issue is not settled by the FCC's undisputed finding that Southwestern cannot prevent its lines from being used for both interstate and intrastate calls.[9] Rather, the question is whether the FCC's order, based on the record before it, could have been narrowed and yet still have achieved the asserted federal policy of ensuring ARCO's ability to interconnect with the public interstate network at locations of its choice--so long as it is not publicly detrimental to do so--without encroaching on Texas's power to control the intrastate certificating process. The FCC found that such a narrow order was not feasible here:
 
 
 21
 [W]herever possible, [we have] tried to tailor our decisions giving effect to the customer's rights of interconnection to accommodate the particular local concerns asserted.... It does not, however, appear to be possible to do so in this case without unduly impairing important federal interests.
 
 
 22
 Memorandum Opinion and Order, 3 F.C.C. Rcd at 3092. The FCC believed that deferring to the Texas PUC's order would negate the federal policy of ensuring access to the interstate network unless ARCO installed redundant equipment to use only for interstate calling:
 
 
 23
 [T]o avoid the impractical and inefficient result of requiring duplicate networks and equipment for interstate and intrastate use, federal interconnection policies must prevail for dual-use equipment and facilities.... There is such a conflict between state and federal interconnection policies in this case. Because of the dual interstate and intrastate use of the private microwave and carrier facilities here at issue, and the configuration of these facilities, acceding to the state action in this case would necessarily negate the federal right of interconnection to the interstate network available to ARCO and telephone customers generally.
 
 
 24
 3 F.C.C. Rcd at 3091 (footnotes and internal paragraphing omitted).
 
 
 25
 We think the FCC's determination and explanation that its order was inseparable were satisfactory, although, as we already noted, Southwestern's inability to separate interstate from intrastate calls does not, by itself, justify pre-emption unless that technological inseparability also prevents the FCC from separating its regulation into interstate and intrastate components. When one bears in mind the posture of this case before the FCC--a petition for "emergency relief" from a Texas PUC order prohibiting Southwestern from laying any additional lines in Dallas, including those which would be needed by ARCO for placing inter state calls with Southwestern--as well as Southwestern's inability to distinguish between intrastate and interstate calls on its lines, the FCC reasonably treated this case as one in which "it was not possible to separate the interstate and intrastate components of ... [its] regulation," Louisiana, 476 U.S. at 375 n. 4, 106 S.Ct. at 1902 n. 4 (emphasis in original)--at least on the record before it.
 
 
 26
 Throughout this dispute, petitioners have implicitly accepted the FCC's assumption of inseparability. This is evident both from the sweeping nature of their cease and desist order and from their assertion that the FCC has no power to pre-empt--in whole or in part--the Texas PUC's order. In contrast to NARUC, where the states suggested a less intrusive form of pre-emption, neither the Texas PUC nor GTE argued to the FCC that the FCC could have fashioned a narrower pre-emption order. Under those circumstances, and where some pre-emption was warranted to ensure ARCO's interstate access, we have no basis to quarrel with the FCC's contention that no order could have accommodated both the local and federal regulatory interests.
 
 
 27
 To be sure, petitioner-intervenors Southern New England Telephone Co., et al. argue in their brief to this court that the FCC might have achieved its federal objective by pre-empting the Texas PUC's order only to the extent that it prohibited ARCO from making interstate calls from Plano via the Southwestern interconnections at Dallas. We understand their theory to be that even if Southwestern cannot distinguish between intrastate and interstate calls, ARCO can, and the FCC could therefore have required ARCO to eschew intrastate calls from Plano over Southwestern's lines. Whatever the merits of this position, we decline to accept it because it was not argued by any party before the FCC. As counsel for the FCC and ARCO pointed out at oral argument, placing the burden of separation on ARCO might be a viable way of narrowing their pre-emption order, but the FCC was not presented with the facts to craft such an order. For instance, if the FCC pre-empted the Texas PUC's order only with respect to some of Southwestern's new lines, it would somehow have had to calculate how many lines Southwestern would need to accommodate ARCO's interstate calls to and from both Dallas and Plano--a task that is severely complicated by the fact that it is apparently impossible, even for ARCO, to separate interstate and intrastate incoming calls. See id. at 48. The FCC bears the burden of showing that its pre-emption order is necessary on the basis of the record developed before it. The Commission is not, however, required to anticipate any conceivable argument that might be raised by intervenors on appeal.
 
 
 28
 Certainly, the Texas PUC sought no middle ground. Relying on its authority to allocate franchise borders for telephone companies in Texas, it acted without any effort to distinguish interstate from intrastate service. Indeed, its order prohibiting Southwestern's provision of "additional" lines does not provide a conceptual basis for distinguishing the service Southwestern provided to ARCO in Dallas prior to 1983 (which, it will be recalled, was capable of carrying Plano calls transmitted over ARCOnet) from that sought in 1983. The FCC legitimately described the Texas PUC's order as "drastic," Memorandum Opinion and Order, 3 F.C.C. Rcd at 3092; it seems to us that, in effect, the Texas PUC threw out the interstate baby with the intrastate bath water.
 
 
 29
 We therefore find it unnecessary in this case to accept the broad proposition that a private microwave operator has an absolute federal right of access to the public switched network at locations of its choice, wholly unimpaired by state regulatory interests, in order to affirm the FCC's order. It is enough that the FCC established--on the record developed before it--the impossibility of ensuring ARCO's freedom of access to the interstate network without pre-empting the extraordinarily broad Texas PUC's order. We do reject the Texas PUC's argument that the FCC has authorized Southwestern to provide local calling in Plano. That simply is not so; ARCO has retained sufficient GTE trunks so that all ARCO's intra-Plano calls will be carried by GTE. Nor do we agree that the FCC has displaced state certification of local exchange carriers. ARCO's Plano access to the public switched network through Southwestern is, rather, the result of ARCO's transmissions across local exchange boundaries through its private microwave system to its Dallas office, where Southwestern provides trunk lines under the authority of its own certificate. We also reject the Texas PUC's argument that ARCO's federal right of access to the public switched network for interstate calls is satisfied so long as the Texas PUC deems its access reasonable--in this case in Plano through the auspices of GTE. That determination, since it involves access to the interstate network, is one the FCC is entitled to make.
 
 
 30
 It should be noted that the FCC did consider Texas's regulatory interest. It suggested that states could protect ratepayers against costs caused by determinations such as ARCO's 1983 decision by imposing reasonable charges for termination of service to minimize the impact of stranded investment and could also allocate costs and revenues among certificated carriers associated with traffic over their facilities. Memorandum Opinion and Order, 3 F.C.C. Rcd at 3091 & n. 21. Whether the FCC should go further and seek a demarcation between interstate and intrastate calls carried on private microwave lines we leave to the case that properly presents these arguments to the FCC.[10]
 
 III.
 
 31
 Petitioners' alternative argument--that the FCC's decision is arbitrary and capricious--is less momentous. For under that standard, we consider only whether the FCC acted reasonably and consistently with its federal policy of interconnection under the Hush-A-Phone test and prior pre-emption decisions arising out of that policy. As we have noted, its order is a considerable extension of Heritage Village Church and Missionary Fellowship, Inc., 88 F.C.C. 2d 1436 (1982), aff'd sub nom. Fort Mill Tel. Co. v. FCC, 719 F.2d 89 (4th Cir.1983), but we disagree with petitioners' view that the FCC's decision is an unexplained departure from either Heritage Village or other precedent. We think that the FCC's order is entirely consistent with its previous decisions in In re American Tel. and Tel. Co. Interconnections with Private Interstate Communications Systems ("ARINC"), 71 F.C.C.2d 1 (1979), Declaratory Ruling: Shared Tenant Servs. ("STS Ruling"), FCC 86-25 (released February 14, 1986), and In re Policies Governing the Provision of Shared Telecommunications Serv. ("STS Rulemaking"), 3 F.C.C. Rcd 6931 (1988).
 
 
 32
 Like the case before us, ARINC involved a request to interconnect a private microwave network to the public network in one state. This line would carry some calls originating outside of the local carrier's certificated area of service. The FCC pre-empted local regulations obstructing access to the public network on the ground that the lines were "indisputably links in the flow of uninterrupted signals across state lines, integral parts of a dedicated interstate communications system." ARINC, 71 F.C.C.2d at 8. Petitioners insist that the network in ARINC did not pose a serious threat to the integrity of local certification because most of the communications there continued to flow through the certificated local carrier. They argue that, in contrast, Southwestern's provision of additional interconnection to ARCO in Dallas would carry the bulk of the Plano lab's interstate and intrastate communications. But petitioners' effort to distinguish ARINC overlooks the legal inquiry that the FCC must undertake under its private benefit and public detriment test. An inquiry into the degree to which a customer uses a private microwave network addresses merely the tradeoff between the volume of traffic on a private microwave network and the local carrier's revenues; hence, the degree of use is another way of reaching the public detriment question. Since the FCC concluded that GTE failed to show public detriment, its order here is perfectly compatible with its pre-emption in ARINC.
 
 
 33
 The Texas PUC's claim that the FCC's decision is at odds with its recent refusal to pre-empt in STS Ruling and the FCC's later elaboration of the rationale in STS Rulemaking presents, however, a more subtle issue. In the new and increasingly popular "shared telecommunications service," the multiple occupants of a building complex use voice and data equipment located on their premises to connect with a shared PBX or other switching device. The switch, in turn, is connected to the local telephone company's central office. The STS switch allows customers of the STS system to call each other directly without using the local certificated carrier, and STS operators can purchase interexchange services at bulk discounts and resell them to their customers. Thus, the STS operator, in bypassing the local certificated carrier, may occupy a position analogous to that of ARCO's private microwave network. In response to the STS development, some states have required "partitioning" of the STS switch, a scheme that prevents aggregation of STS customer demand and requires the use of the same number of access lines as if the shared arrangement did not exist. Even with partition, however, STS still represents an economic saving for its users. See 3 F.C.C. Rcd at 6935. In refusing to pre-empt these state regulations, the FCC was concerned that the STS operator's purchase and resale of local telephone services may pose too direct a threat to local carriers. See id. The FCC could reasonably believe, however, that ARCO's use of its microwave system, which does not involve bulk resales of local services, presented a less compelling threat which can be offset as the FCC suggested by state adoption of such devices as termination charges. See p. 1334 supra. The FCC also noted, in STS Rulemaking, the relative novelty of STS systems and recognized that state regulators were developing new regulatory schemes, other than partition, to preserve savings to STS users while protecting local revenues. See 3 F.C.C. Rcd at 6936. The FCC's decision not to pre-empt state regulation of STS, then, in part was based on its recognition that both the technology and the state regulatory responses were still at early stages.
 
 
 34
 Nor do we believe, as petitioners argue, that the FCC failed to consider adequately their evidence of "public detriment" under the Hush-A-Phone test. Public detriment requires a showing of "technical harm to the telephone system or economic impact which adversely affects the ability of a carrier adequately to serve the public, or both." AT & T Premises Ruling, 60 F.C.C.2d 939, 943 (1976); see also Carterfone, 13 F.C.C.2d 420, recon. denied, 14 F.C.C.2d 571 (1968). The burden of proof rests on the carrier to demonstrate either the harm to the network or the severe economic losses, see Amendment of Part 68, 94 F.C.C.2d 5, 14 (1983); ARINC, 71 F.C.C.2d at 10; AT & T Premises Ruling, 60 F.C.C.2d at 943, and the carrier must prove that the public detriment is "direct, substantial and immediate." Mebane Home Tel. Co., 53 F.C.C.2d 473, 480 (1975), aff'd mem., 535 F.2d 1324 (D.C.Cir.1976).
 
 
 35
 We are satisfied with the FCC's conclusion that GTE failed to carry its burden of proving public detriment with particularized facts. See Memorandum Opinion and Order, 3 F.C.C. Rcd at 3091. GTE does not contest the Commission's finding that the additional interconnections would comply with the applicable federal and state tariffs and the technical requirements designed to protect the telephone network. See id. Nor did GTE demonstrate an economic loss severe enough to jeopardize its ability adequately to serve the public. GTE will surely lose some revenue from the ARCO interconnection injury. But neither GTE nor the Texas PUC quantified the carrier's estimated losses; the record indicates only that GTE's $312,000 investment in plant for ARCO's use and the $228,000 annual revenues from ARCO were tiny fractions of GTE's $2 billion investment in Texas and $560 million in annual revenues. See Texas PUC Order at 4; 3 F.C.C. Rcd at 3090, 3094 n. 18. Petitioners never demonstrated how much of GTE's investment would be duplicated or how much more network planning would be hindered. The Texas hearing examiner, it will be recalled, had explicitly concluded that "there would be no overall detriment to the public caused by the interconnection...." Examiner's Report at 23. Without more, then, these costs simply do not amount to direct, substantial and immediate harm.
 
 
 36
 Finally, we turn to the Texas PUC's argument that if the FCC demands rigorous, quantitative evidence of public detriment from the local carrier, a similarly stringent requirement should be imposed on ARCO in showing private benefit. This "double standard," the Texas PUC believes, is arbitrary and capricious. We, however, find the FCC's rationale for requiring concrete evidence of economic loss from petitioners eminently reasonable. If a carrier's mere showing that some losses would be sustained from a decision to interconnect to another public switched network could qualify as public detriment, "then carriers would be able to prevent almost any customer choice of interconnection, other than the one preferred by the carrier. Such a result ... would eviscerate this Commission's federal interconnection policies." 3 F.C.C. Rcd at 3094 n. 20. By contrast, the FCC could quite legitimately assume that private businesses would not request interconnection, with its concomitant costs and delays, unless it were worthwhile to do so.[11] Private benefits are normally presumed because the customer incurs costs in pursuing interconnection, see Fort Mill Tel. Co. v. FCC, 719 F.2d 89, 91 (4th Cir.1983), and the Texas PUC specifically concluded that the interconnections here would be "privately beneficial to ARCO." Texas PUC Order at 3. We, therefore, conclude the FCC's different evidentiary burdens for private benefit and public detriment to be not arbitrary and capricious.
 
 Accordingly, the petition for review is
 
 37
 Denied.
 
 
 
 [1]
 47 U.S.C. Secs. 151-609 (1982 & Supp. V 1987)
 
 
 [2]
 A PBX is a customer-provided switch that automatically transfers, or "switches," calls between the subscriber's private telephone stations and other locations
 
 
 [3]
 A DID trunk is a circuit that enables incoming calls to reach end users without the intervention of a PBX switchboard and an operator
 
 
 [4]
 Southern Bell, we assume, was also operating in South Carolina. Otherwise, the South Carolina PUC would not have had authority over Southern Bell and therefore could not have compelled it to discontinue its service to Heritage
 
 
 [5]
 The Texas PUC seems to be asserting that its certification authority includes determining to whom local exchange carriers offer exchange services, irrespective of the interstate or intrastate character of the calls involved. As our discussion of Louisiana Pub. Serv. Comm'n v. FCC, 476 U.S. 355, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986), infra, makes clear, however, this position is at odds with our interpretation of the Communication Act's regulatory scheme
 Petitioners also rely on section 221(b) of the Act:
 [N]othing in this chapter shall be construed to apply, or to give the Commission jurisdiction, with respect to charges, classifications, practices, services, facilities, or regulations for or in connection with wire ... exchange service ... even though a portion of such exchange service constitutes interstate or foreign communication, in any case where such matters are subject to regulation by a State commission or by local governmental authority.
 47 U.S.C. Sec. 221(b) (emphasis added).
 We agree, however, with the Fourth Circuit that this somewhat circular language was--as is manifest in the legislative history--designed to deal only with local exchanges covering metropolitan areas whose boundaries happen to cross state lines. A state has a right to regulate a carrier serving such an exchange to the same degree it would if the local exchange were entirely within the borders of one state. See North Carolina Utils. Comm'n v. FCC ("NCUC II"), 552 F.2d 1036, 1045 (4th Cir.), cert. denied, 434 U.S. 874, 98 S.Ct. 222, 54 L.Ed.2d 154 (1977); North Carolina Utils. Comm'n v. FCC ("NCUC I"), 537 F.2d 787, 795 (4th Cir.), cert. denied, 429 U.S. 1027, 97 S.Ct. 652, 50 L.Ed.2d 631 (1976).
 
 
 [6]
 The Court also rejected the FCC's contention that section 220 of the Act--which authorizes the FCC to formulate depreciation rules--indicated a specific congressional intent for exclusive federal regulation of depreciation and thereby authorized pre-emption. See id. 476 U.S. at 369, 106 S.Ct. at 1899
 
 
 [7]
 The FCC also asserted that section 2(b) of the Communications Act barred only its jurisdiction over intrastate common carrier communication services. This court, relying on Louisiana, rejected this narrow construction of section 2(b). See NARUC, 880 F.2d at 430
 
 
 [8]
 Centrex[ ] is a tariffed service sold by local phone companies. It offers such telecommunications functions as intercom calling, conference calling, direct inward dialing, and automatically identified outward dialing.... These electronic switching services are performed at the exchange carrier's central office switch, and have traditionally been offered principally to large organizations and government agencies as an alternative to purchasing or leasing a private branch exchange ("PBX")
 National Ass'n of Regulatory Util. Comm'rs v. FCC, 737 F.2d 1095, 1122 (D.C.Cir.1984), cert. denied, 469 U.S. 1227, 105 S.Ct. 1225, 84 L.Ed.2d 364 (1985) (citation omitted).
 
 
 [9]
 The FCC stated:
 Based on the record before us, Southwestern Bell is not able to monitor and/or prevent ARCO from using its private microwave facilities to interconnect at Dallas for Plano intrastate calls, short of terminating all its interconnections at Dallas, including those used for purposes of originating and terminating Dallas and Plano interstate traffic.
 * * *
 [T]he decision of the Texas PUC, while directed at the locally tariffed offerings of Southwestern Bell, would necessarily preclude ARCO's ability to interconnect at the location in question for the purpose of interstate communications.... [T]he Commission clearly has authority to preempt inconsistent state common carrier regulation where, as in the case of network interconnection policies, it is not practical to separate the interstate and intrastate communications.
 Memorandum Opinion and Order, 3 F.C.C. Rcd at 3092 (emphasis in original) (footnotes omitted).
 
 
 [10]
 Even if a private microwave operator can distinguish between its interstate and intrastate calls on a particular set of lines, it is hard to see why it could not avoid state Y's regulation by simply, as an extension of Heritage Village, gaining access to the public switched network in an adjoining state X. It may well be that the Texas PUC is a modern day King Canute seeking to hold back new technological waves
 
 
 [11]
 Indeed, ARCO so firmly believed in the private benefits of the additional interconnection with Southwestern that ARCO continued to pay GTE for five years for the connections ARCO had terminated, simply to prevent the Texas PUC from handing down an interim order blocking the interconnection with Southwestern in Dallas. By July 1987, ARCO had paid nearly $350,000 in duplicative payments to GTE for lines ARCO no longer needed. Petition for Emergency Relief and Declaratory Ruling ii (July 1, 1987)