909 F.2d 1510
 285 U.S.App.D.C. 329, 114 P.U.R.4th 383
 PUBLIC SERVICE COMMISSION OF MARYLAND and the Maryland
Office of People's Counsel, Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and the United States of
America, Respondents,
Pennsylvania Public Utility Commission, Bell Atlantic
Telephone Companies, American Telephone and Telegraph
Company, MCI Telecommunications Corporation, National
Association of Regulatory Utility Commissioners, New York
Telephone Company, et al., Mountain States Telephone and
Telegraph Company, Northwestern Bell Telephone Company,
Pacific Northwest Bell Telephone Company, State of Michigan,
Michigan Public Service Commission, Florida Public Service
Commission, Public Service Commission of the District of
Columbia, United States Telephone Association, Intervenors.
 No. 89-1424.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued April 27, 1990.
Decided Aug. 3, 1990.
 
 Sandra Hall-Eckroade, with whom Bryan G. Moorhouse and John M. Glynn, were on the brief, for petitioner.
 John E. Ingle, Deputy Associate Gen. Counsel, F.C.C., with whom Robert L. Pettit, Gen. Counsel, and Linda L. Oliver, Atty., F.C.C., James F. Rill, Asst. Atty. Gen., Catherine G. O'Sullivan and Andrea Limmer, Attys., U.S. Dept. of Justice, were on the brief, for respondents. Diane S. Killory and Daniel M. Armstrong, Attys., F.C.C., also entered appearances, for petitioners.
 
 
 1
 David E. Smith and Debra W. Schiro for Florida Public Service Com'n, Paul Rodgers and Charles D. Gray for Nat. Ass'n of Regulatory Utility Com'rs, were on the joint brief, for intervenors.
 
 
 2
 Francine J. Berry, Michael J. Morrissey, David W. Carpenter, and Peter D. Keisler for American Tel. & Tel. Co., Mark J. Mathis and J. William Sarver for Bell Atlantic Telephone Companies, and Martin T. McCue for U.S. Telephone Ass'n were on the joint brief, for intervenors. Thomas L. Welch also entered an appearance, for intervenor Bell Atlantic Telephone Companies.
 
 
 3
 Veronica A. Smith, John F. Povilaitis and Sonia M. Walwyn entered appearances, for intervenor Pennsylvania Public Utility Com'n.
 
 
 4
 Frank W. Krogh and John M. Scorce, entered appearances, for intervenor MCI Telecommunications Corp.
 
 
 5
 Martin J. Silverman and Saul Fisher, entered appearances, for intervenor NYNEX Telephone Companies.
 
 
 6
 Dana A. Rasmussen and Robert B. McKenna, entered appearances for intervenors Mountain States Tel. & Tel. Co., Northwestern Bell Telephone Co., and Pacific Northwest Bell Telephone Co.
 
 
 7
 Frank J. Kelley, Louis J. Caruso, Don L. Keskey, and Henry J. Boynton, entered appearances for intervenors State of Michigan and Michigan Public Service Com'n.
 
 
 8
 Howard C. Davenport and Mary J. Sisak entered appearances for intervenor Public Service Com'n for the District of Columbia.
 
 
 9
 Before EDWARDS, SILBERMAN and WILLIAMS, Circuit Judges.
 
 
 10
 Opinion for the Court filed by Circuit Judge SILBERMAN.
 
 SILBERMAN, Circuit Judge:
 
 11
 The Maryland Public Service Commission petitions for review of an FCC order refusing to modify an FCC regulation that, inter alia, preempts the states' authority to regulate the rates of a particular service local exchange carriers provide to interexchange carriers. We deny the petition.
 
 I.
 
 12
 This case presents a jurisdictional dispute between the FCC and the Maryland PSC primarily over the authority to regulate the price charged by a local exchange carrier ("LEC") to interexchange carriers for a service called DNP. DNP involves the disconnection by an LEC of a local subscriber's telephone for non-payment of his bill. The bill can be for either interstate (interexchange) or local service.[1] In either event, DNP involves total disconnection; it prevents the customer from using his phone at all for both interstate and local calls. DNP thus is an extremely attractive service to interexchange carriers: a delinquent customer is more likely to be convinced to pay his interexchange bill by the threat of a cutoff of all phone service than by the prospect of referral to a collection agency. DNP is offered by the LECs as part of an overall billing and collection service they provide to AT & T, and it may presumably also be provided separately to other interexchange carriers--such as MCI and Sprint--which have developed their own billing and collection operations.
 
 
 13
 Prior to the breakup of the Bell System pursuant to the Modification of Final Judgment, United States v. American Tel. & Tel. Co., Inc., 552 F.Supp. 131 (D.D.C.1982), aff'd sub nom. Maryland v. United States, 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983) ("MFJ "), the FCC unquestionably had jurisdiction over all billing and collection services provided by one part of the Bell system to another. During that period, the LECs (then referred to as Bell Operating Companies or "BOCs") offered customers joint rate interstate service in conjunction with AT & T. Consequently, when the LECs billed customers for AT & T interexchange service, they were billing and collecting for their own communications offering. Billing and collecting for a carrier's own offering is part and parcel of providing that service in the first place, and since the service itself fell within the FCC's jurisdiction, the billing and collecting process did as well. The LECs' costs for billing and collecting services were allocated between intrastate and interstate accounts according to the jurisdictional separation procedure. See generally 47 C.F.R. Part 36.
 
 
 14
 The MFJ, however, required AT & T both to divest itself of the LECs and to terminate the joint rate interstate service it had offered to customers in conjunction with the LECs. See MFJ, 552 F.Supp. at 141-143. Thus, billing and collection for interexchange service by the LECs became a service sold to another carrier. As AT & T remained dependent upon the LECs for billing and collection, the FCC nonetheless continued to regulate billing and collection services provided by the LECs. The FCC's initial concern was to ensure that the LECs provided such services--and particularly the important collection tool DNP--on a non-discriminatory basis to all interexchange carriers. Accordingly, it established a federal access tariff (which it regulated under Title II of the Communications Act, see 47 U.S.C. Sec. 201) for billing and collection performed for an interexchange carrier and required an LEC offering such services to one interexchange carrier to offer them to all. See MTS and WATS Mkt. Structure, Third Report and Order, 93 F.C.C.2d 241, 313 (1983). The Commission limited the LECs' return on these services to 12.75%. See Investigation of Access and Divestiture Related Tariffs and MTS and WATS Mkt. Structures, 49 Fed.Reg. 2394 (1984).
 
 
 15
 In addition, recognizing that the ability to disconnect both local and interexchange service for non-payment of the interexchange bill gives the LECs' billing and collecting services a powerful market advantage over erstwhile competitors, the FCC initially prohibited linking the two, i.e., it forbade the LECs from cutting off local service as well as interexchange service for non-payment of the interexchange bill. In response to this order, the LECs submitted technical data demonstrating that it was not possible to disconnect one without disconnecting the other. The FCC therefore retreated and permitted the LECs to continue to provide full disconnection for nonpayment of interexchange bills (subject to the approval of such service by state authorities) while it studied the matter further. See Investigation of Access and Divestiture Related Tariffs, Phase I, Mimeo No. 4246 (CC Docket No. 83-1145) (May 16, 1984).
 
 
 16
 In 1986, the FCC reexamined both its post-breakup jurisdiction to regulate the LECs' provision of billing and collection services and the desirability of continued regulation. The FCC acknowledged that it could no longer exercise jurisdiction over billing and collection services on the basis of Title II of the Act because it was now apparent--after the breakup--that these services were not "common carrier services" (see supra pp. 1511-1512). Detariffing of Billing and Collection Servs., Report and Order, 102 F.C.C.2d 1150, 1168 (1986) ("Detariffing Order"). Instead, it rested its jurisdiction in this area on its authority under Title I to regulate (or deregulate) services " 'incidental' " to the transmission of communication by wire. Id. at 1169 (quoting 47 U.S.C. Secs. 152-153). Moreover, seeing that the LECs were facing competition in the billing and collection area, and therefore that a market for these services was developing, it decided to eliminate all rate regulation of the billing and collection services provided by the LECs to interexchange carriers. See id. at 1170-71. And to prevent the states from attempting to fill this new regulatory gap, the Commission preempted the states from regulating billing and collection rates charged by the LECs to interexchange carriers, including rates for DNP (which Wyoming and Maine had previously sought to regulate). See id. at 1177. But the FCC left the states free to determine whether to permit the LECs to offer DNP at all and to regulate "questions such as the amount of notice that a customer must be given before discontinuance occurs." Id. at 1176-1177.[2]
 
 
 17
 In the meantime, before the FCC issued its final order in the detariffing proceeding, the Maryland PSC ordered Chesapeake and Potomac Telephone Company ("C & P"), over its protests, to impose a $4.2 million surcharge on AT & T for DNP. AT & T sued to prevent the surcharge in federal district court in Maryland, see AT & T Communications of Maryland, Inc. v. Public Service Comm'n of Maryland, No. N-85-4709 (filed Nov. 19, 1985), and after the Detariffing Order was issued it amended its complaint to seek enforcement of the FCC's decision to preempt state regulation of rates charged for DNP. The Maryland PSC did not seek review of the Detariffing Order within the required 60 day statutory period, see 28 U.S.C. Sec. 2344, nor did it seek reconsideration by the FCC within the 30 day time limit, see 47 U.S.C. Sec. 405(a); instead, after those periods had run, it filed a petition with the FCC for a declaratory ruling that the preemption component of the Detariffing Order had been undermined by the Supreme Court's intervening decision in Louisiana Pub. Serv. Comm'n v. FCC, 476 U.S. 355, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986) ("Lousiana PSC "). The district court proceeding was stayed until the Maryland PSC's petition was resolved, including any judicial review.
 
 
 18
 The Common Carrier Bureau of the Commission denied the petition. It determined that the petition was an untimely request for reconsideration of the Detariffing Order. See Public Serv. Comm'n of Maryland, 2 F.C.C. Rcd. 1998, 2002-2003 (1987). It did concede that it could construe the petition "as a petition for Rule Making that requests a reexamination of the Commission decision to preempt such state regulations" but then declined to do so. Id. at 2003. The full Commission affirmed in all respects. See Public Serv. Comm'n of Maryland, 4 F.C.C.Rcd. 4000 (1989). While the FCC agreed that the petition could not be taken as a petition for reconsideration because the period for such requests had expired, see id. at 4003, it too noted that "Maryland could have asked this Commission to initiate a new Rule Making proceeding to determine whether the preemption of state rate regulation should be revoked in whole or in part." Id. at 4004. It then determined that Louisiana PSC did not affect the Detariffing Order's preemptive component, and, for that reason, refused to initiate further rulemaking on the issue. See id. at 4006.
 
 II.
 
 19
 Seeking review in this court of the FCC's denial of its petition for a declaratory ruling, the Maryland PSC first mounts a broad-scale attack on the FCC's Detariffing Order, claiming that billing and collection services cannot be thought to be "incidental" to interstate communications now that AT & T and the LECs are separate companies.[3] If it were, FCC jurisdiction would encompass billing and collection services provided to interexchange carriers by any company whether or not in the communications business. And, for that matter, since it is impossible analytically to distinguish billing and collection services from any other service that an interexchange carrier might purchase, FCC jurisdiction would thereby be extended throughout our economy.
 
 
 20
 It is unnecessary for us to wrestle with this puzzling question, however, since we do not think that the Maryland PSC can challenge the entire basis for the Detariffing Order after the 60 day period for review has passed just as it could during that period. See Microwave Communications, Inc. v. FCC, 515 F.2d 385, 389 (D.C.Cir.1974); cf. Natural Resources Defense Council v. Nuclear Regulatory Comm'n, 666 F.2d 595, 602 (D.C.Cir.1981) ("The 60 day period for seeking judicial review ... is jurisdictional in nature, and may not be enlarged or altered by the courts."). After all, the Maryland PSC did not quarrel with the FCC's interpretation of "incidental" when the Detariffing Order was issued, and its only justification for its petition for a declaratory ruling before the FCC was the intervening Louisiana PSC case. That case does arguably bear on the FCC's interpretation of Section 2(b) of the Communications Act, see 47 U.S.C. Sec. 152(b), which precludes FCC jurisdiction over intrastate communication services, but it does not bear at all on the FCC's construction of the words "services incidental to [the] transmission [of communication by wire]" in Section 3(a) of the Act.[4]
 
 
 21
 The Maryland PSC also makes a narrower claim: that, under Louisiana PSC, Section 2(b) prevents the FCC from preempting state regulation of the rates charged for DNP, even assuming that the FCC could exercise jurisdiction over billing and collection services provided to interexchange carriers by the LECs. We do think that we have jurisdiction to consider this argument. The FCC itself recognized that the Maryland PSC's petition before it could be considered as a petition for new rulemaking asking it to reexamine its decision to preempt in light of the Supreme Court's opinion. Although the FCC ostensibly declined to construe the petition in that fashion, it seems to us that it actually did so and rejected the petition's legal premise, that Louisiana PSC undermined the basis for its preemption order. Indeed, at oral argument counsel for the FCC conceded as much:
 
 
 22
 Q. You don't really object to this being here as a denial for rulemaking or a modification of a rule?
 
 
 23
 A. No, sir, I don't, I can't deny that, because we treated it that way ourselves....
 
 Tr. of Oral Arg. at 24.[5]
 
 24
 We therefore have before us solely the question of whether the FCC's refusal to modify its detariffing rule, by eliminating the preemption component, was in violation of the Administrative Procedure Act because that refusal was arbitrary and capricious or contrary to law. See 5 U.S.C. Sec. 706. This in turn reduces to the legal issue of whether the FCC can, consistent with Louisiana PSC's construction of Section 2(b) of the Communications Act, preempt the states from setting rates charged by the LECs to interexchange carriers for DNP.
 
 
 25
 Section 2(b) provides, in pertinent part, that "nothing in this chapter shall be construed to apply or to give the Commission jurisdiction with respect to (1) charges, classifications, practices, services, facilities, or regulations for or in connection with intrastate communication service by wire...." 47 U.S.C. Sec. 152(b). This section represents the 73rd Congress' attempt "to divide the world of telephone regulation neatly into two separate components:" interstate communications, which can be regulated by the FCC; and intrastate communications, which cannot. Public Util. Comm'n of Texas v. FCC, 886 F.2d 1325, 1329 (D.C.Cir.1989) ("Texas PUC "). However, "since most aspects of the communications field have overlapping interstate and intrastate components, th[is] ... section[ ] do[es] not create a simple division; rather, [it] create[s] a persistent jurisdictional tension." Id.
 
 
 26
 Recognizing this tension and overlap, the Supreme Court in Louisiana PSC said the FCC may preempt state regulation of an intrastate matter only when the matter has interstate aspects as well and when it is "not possible to separate the interstate and the intrastate components of the asserted FCC regulation." 476 U.S. at 375 n. 4, 106 S.Ct. at 1902 n. 4 (emphasis in original). FCC preemption of state regulation is thus permissible when (1) the matter to be regulated has both interstate and intrastate aspects, see, e.g., Illinois Bell Tel. Co. v. FCC, 883 F.2d 104, 113 (D.C.Cir.1989); (2) FCC preemption is necessary to protect a valid federal regulatory objective, see National Ass'n of Regulatory Util. Comm'rs v. FCC, 880 F.2d 422, 431 (D.C.Cir.1989) ("NARUC "); and (3) state regulation would "negate[ ] the exercise by the FCC of its own lawful authority" because regulation of the interstate aspects of the matter cannot be "unbundled" from regulation of the intrastate aspects. Id. at 429, 430; see also Texas PUC, 886 F.2d at 1331-33. The Maryland PSC maintains that none of these conditions exist here, and we will address each in turn.
 
 
 27
 The Maryland PSC's fundamental position is that DNP is an exclusively intrastate matter. It argues that when C & P agrees to disconnect local service to force payment of an interexchange bill it is in effect selling control of the local service to the interexchange carrier for use as leverage. Local ratepayers, the State continues, should be compensated for this sale to the interexchange carriers because it is they who support the local service. It is therefore perfectly appropriate both that the local ratepayer be compensated--that the interstate ratepayer be charged in excess of the amount the LEC wishes to charge so that local rates can be reduced accordingly--and that the states determine the size of the compensation. Contrary to the state's argument, however, we have frequently held that services provided locally by the LECs which support access to the interstate communications network have interstate as well as intrastate aspects. See, e.g., Illinois Bell, 883 F.2d at 110 n. 4, 114; Texas PUC, 886 F.2d at 1331; see also National Ass'n of Regulatory Util. Comm'rs v. FCC, 737 F.2d 1095, 1113 (D.C.Cir.1984), cert. denied, 469 U.S. 1227, 105 S.Ct. 1224, 1225, 84 L.Ed.2d 364 (1985).[6]
 
 
 28
 The Maryland PSC next contends that the FCC's asserted justification for preemption--that "[s]tate rate regulation of [DNP] ... might lead to excessive charges that would tend to frustrate the goals of the Communications Act," Detariffing Order, 102 F.C.C.2d at 1177--is not a valid federal objective. As a matter of economics, the FCC seems to have the better argument. Since the LECs have proven to be vigorous competitors of AT & T in a variety of encounters, there apparently is no reason to believe that they are not charging AT & T (or other interexchange carriers) the optimal price for DNP as a feature of their billing and collection services. To be sure, only the LECs can provide DNP itself; it is a bottleneck monopoly. But as the FCC noted, "[w]hile it is true that LECs possess the unique ability to offer local cut-offs, this ability simply gives LECs an additional selling point. It has not acted as an insurmountable competitive advantage.... ICs [interexchange carriers] regard price as a more important consideration than the local cut-off option in choosing a billing and collection service." Id. at 1171. We take it that the FCC means by that statement that there is only so much that the LECs can charge for DNP without losing the interexchange carrier billing and collection business to competitors or to the interexchange carrier itself (which is another way of saying that the demand for local cut-off is price elastic). That explains why C & P objects to the increased charge; it is obviously concerned that its revenues would be reduced by increasing the charge for DNP--to the detriment of local ratepayers.
 
 
 29
 We doubt, however, that the FCC may preempt state regulation--in light of Section 2(b)--simply on the grounds that it is economically irrational or even that it imposes too great an economic burden on carriers engaged in both interstate and intrastate communications. In Louisiana PSC, the Supreme Court rejected an FCC preemption order that barred the states from requiring carriers to employ a different depreciation schedule for intrastate regulation than the one the FCC required for interstate regulation. See 476 U.S. at 373, 106 S.Ct. at 1901. That the dual approach was burdensome to the carriers or even interfered with the FCC's goal of accelerating technological advances was not sufficient justification for preemption. That case suggests that the FCC may not preempt solely because state regulation of a matter of primarily local interest (which directly impacts on rates for intrastate services) conflicts with its ideas of sound federal economic or regulatory policy. See id. at 372, 376, 106 S.Ct. at 1900, 1902.
 
 
 30
 In any event, it appears to us that the FCC's objection to the Maryland PSC's action is more narrowly focused upon the protection of interstate interests than was true in Louisiana PSC. The $4.2 million surcharge is concededly designed directly to force the interstate ratepayer to pay more than market value and more than the FCC believes is just for services provided by the LEC. The very purpose of the government's antitrust suit against AT & T, which led to the dismantling of the Bell System, was to free the interstate market to competition and to end the cross-subsidy the interstate ratepayer was paying to the local ratepayer. And for many years preceding that suit, the separations procedure was relied upon to ensure that AT & T's costs were apportioned equitably between local and interstate ratepayers. See, e.g., Smith v. Illinois Bell Tel. Co., 282 U.S. 133, 51 S.Ct. 65, 75 L.Ed. 255 (1930). Therefore, a direct effort by a state to impose costs on interstate service that the FCC believes are unwarranted seems rather clearly within the FCC's authority to prevent. Cf. Texas PUC, 886 F.2d at 1334 (preventing state encroachment on federal interstate telecommunications policy is a valid FCC regulatory objective).
 
 
 31
 There remains the question of whether regulation of the interstate aspects of DNP can be "unbundled" from its intrastate aspects which, in turn, depends on whether in disconnecting a customer's local service for nonpayment of his interexchange bill, an LEC must also disconnect his interstate service. If it must do so, the local disconnection falls within the FCC's regulatory jurisdiction because it would be impossible to separate the interstate and intrastate components of DNP.
 
 
 32
 The Maryland PSC suggests that it may be possible technologically to cut off interstate access independent of local service. It claims that the FCC's preemptive order is consequently overbroad, for "the FCC must limit its regulation to the interstate aspects if it can do so." Texas PUC, 886 F.2d at 1333. That argument is similar to the one we encountered in Texas PUC, see 886 F.2d at 1333-34, and our reaction is the same. At the time it issued the Detariffing Order, the FCC believed that such a separation was not practical. See Detariffing Order, 102 F.C.C.2d at 1166-67. The Maryland PSC has not introduced any evidence in its own proceedings or before the FCC to cast doubt on this finding. And where the state has not suggested a means to unbundle the interstate and intrastate components of a matter, "we have no basis to quarrel with the FCC's contention that no order could have accommodated both the local and federal regulatory interests." Texas PUC, 886 F.2d at 1334. If the Maryland PSC should produce such evidence, that would present a different case.
 
 
 33
 * * * * * *
 
 
 34
 We conclude that the FCC order could properly preempt the states' authority to regulate the rates the LECs may charge for DNP. Accordingly, the Maryland PSC's petition for review is
 
 
 35
 Denied.
 
 
 
 [1]
 The FCC has sought to preempt state rate regulation only with respect to interstate DNP. See Detariffing of Billing and Collection Servs., Report and Order, 102 F.C.C.2d 1150, 1177 (1986); Detariffing of Billing and Collection Servs., Memorandum and Order on Reconsideration, 1 F.C.C.Rcd. 445, 446 (1986)
 
 
 [2]
 Subsequently, in a Joint Cost Order, 2 F.C.C.Rcd. 1298, on recon., 2 F.C.C.Rcd. 6283 (1987), the Commission decided to continue regulated accounting treatment of billing and collection services supplied by the LECs, i.e., the costs of those activities were still to be allocated between interstate and intrastate accounts in a separations proceeding
 
 
 [3]
 It does not appear that the states would wish to regulate the price of any other aspect of billing and collection services offered by the LECs to interexchange carriers. The LECs also have performed a recording function--providing the interexchange carriers with the necessary call detail to permit the creation of bills--that cannot be offered by non-carrier billing and collection businesses. But the interexchange carriers apparently may do this also, so the LECs do not enjoy market power over this function. See Detariffing Order, 102 F.C.C.2d at 1173
 
 
 [4]
 For the same reason, we decline to consider the Maryland PSC's challenge to the Joint Cost Order's provisions continuing the separation process for billing and collection services, including DNP. Petitioner's argument on this issue likewise depends upon its construction of "incidental" and thus should (and could) have been pressed within the 60 day period
 
 
 [5]
 Not much of a concession really, since it likely would be arbitrary and capricious for an agency to refuse to reexamine a rule arguably inconsistent with a new Supreme Court decision
 
 
 [6]
 The state argues that the implications of this position would mean that the FCC would then have jurisdiction to prevent the states from cutting off local service for any reason, such as for violation of state laws prohibiting misuse of telephones or violation of an LEC tariff. But we do not think that follows at all. The FCC cannot regulate (let alone preempt state regulation of) any service that does not fall within its Title II jurisdiction over common carrier services or its Title I jurisdiction over matters "incidental" to communication by wire. Many of the reasons for local cutoffs do not even arguably fall within this jurisdictional grant. Other reasons will either not bear at all upon federal policies or not clash with those policies, and FCC preemption will accordingly not be justified. In any event, Maryland's concerns are purely hypothetical--the FCC has recognized the states' strong parallel interest in the conditions under which an individual would have access to local service; it has left to the states the decision whether the LECs can offer DNP at all. There is thus simply no reason to believe that the FCC will seek to interfere with the states' police power in this respect