**BRITTAN COMMUNICATIONS INTERNATIONAL CORPORATION**
Plaintiff,

v.

**SOUTHWESTERN BELL TELEPHONE COMPANY** Defendant.

No. CIV.A. G–00–480.

United States District Court,
S.D. Texas,
Galveston Division.

Nov. 9, 2001.

Alton C. Todd, Friendswood, TX, William J. Eggleston, Tracy L. Jackson, Eggleston & Briscoe, Houston, TX, for Plaintiff.

Philip J. John, Jr., J. Bruce McDonald, Baker Botts,c Houston, TX, Madeline Eileen Dabney, San Antonio, TX, for Defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

KENT, District Judge.

Now before the Court is Defendant Southwestern Bell Telephone Company's ("SWBT") Motion for Judgment on the Pleadings, or, in the alternative, Motion for Summary Judgment as to claims brought by Plaintiff Brittan Communications International Corporation ("Brittan") pursuant to the Communications Act, 47 U.S.C. §§ 151–613, the Telecommunications Act of 1996, 47 U.S.C. §§ 251–53, and the Texas Deceptive Trade Practices Act, Tex.Bus. & Com.Code § 17.41 *et seq.* ("DTPA"). Also before the Court is SWBT's Motion for Summary Judgment as to Plaintiff's Texas state law claims of fraud, tortious interference with contractual relations and tortious interference with business relations. At the outset, the Court notes that the instant Motions involve hotly contested issues, extensive briefing and numerous objections by both parties to the summary judgment evidence. The Court has carefully and thoughtfully reviewed all of the materials on file in this matter, and in light of all the evidence presented, the Court concludes that, for the reasons articulated below, SWBT's Motion for Judgment on the Pleadings is **GRANTED** with respect to Brittan's claims brought pursuant to the Communications Act and the Telecommunications Act of 1996, and SWBT's Motion for Summary Judgment is **GRANTED** with respect to Brittan's DTPA, fraud and tortious interference claims.

### I.

Brittan began operating as a switchless reseller of long-distance telephone services in 1995. Brittan did not have its own telecommunications facilities, but rather leased long-distance access from existing long-distance carriers. Brittan then resold the leased long-distance services to its customers in forty-two states. Brittan was headquartered in Houston, Texas and approximately 40% of Brittan's customers were located in the five-state area within

which SWBT provides local telephone service.[1]

As is common in the telecommunications industry, Brittan billed its customers through local exchange carriers, here SWBT. In order to do so, Brittan submitted its charges to a third-party billing aggregator with whom Brittan had a contract, namely, Billing Concepts or its subsidiaries, U.S. Billing and Zero Plus Dialing (collectively "Billing Concepts").[2] Brittan was one of multiple long-distance providers on whose behalf Billing Concepts performed billing aggregation services. Billing Concepts aggregated Brittan's charges with those of the other long-distance providers and submitted them to SWBT. SWBT would then place Brittan's charges on the bills of its local telephone service customers. Once the SWBT customers remitted payments, SWBT would forward the monies received to Billing Concepts, which would then transfer the funds to Brittan in due course.

In November 1998, SWBT ceased billing Brittan's customers for Brittan-generated charges, without first informing Brittan that it intended to do so. Thus, while Brittan's customers continued to make long-distance calls, for which Brittan had to pay its lessors, Brittan was unable to bill those customers through SWBT.

According to SWBT, it suspended billing services for Brittan in response to a large number of "slamming" and "cramming" complaints by SWBT's local customers.[3] In late October of 1998, after SWBT conducted a survey of customer complaints,

SWBT concluded that resale of long-distance services by Brittan was generating a high volume of these complaints. In fact, the survey results indicated that more complaints had been filed against Brittan than against any other long-distance provider.

Before any action against Brittan was taken, SWBT sent a letter to Billing Concepts outlining its concerns regarding customer complaints. Instead of suspending its billing for Brittan-generated charges immediately, SWBT provided Billing Concepts with additional time to review the cause of the numerous complaints, and requested that Billing Concepts inform SWBT of any reasons known to Billing Concepts that would prevent SWBT from taking action against Brittan. SWBT alleges that because it did not receive sufficient information (namely, plans outlining a specific framework designed to reduce end user customer complaints) from Billing Concepts in a timely manner, SWBT suspended its acceptance of billing from Billing Concepts for all Brittan-generated charges.

On or about November 24, 1998, Billing Concepts informed SWBT that Brittan should be reinstated on Southwestern Bell's billing tables.[4] On November 30, 1998, SWBT responded to Billing Concepts, informing them that Brittan would be placed on the billing table by December 24, 1998. On December 15, 1998, Southwestern Bell resumed billing for Brittan-generated charges submitted by Billing Concepts. The money collected from

---

1. SWBT is licensed to provide local telephone exchange service in five states: Texas, Missouri, Kansas, Arkansas and Oklahoma.

2. Brittan and SWBT did not have a contractual relationship. Billing Concepts, not Brittan, contracted with SWBT.

3. "Cramming" is charging an end user customer for services that were not ordered, authorized or used. "Slamming" is switching an end user's long-distance provider without the end user's consent.

4. SWBT and Billing Concepts had previously agreed that the decision to reinstate Brittan belonged to Billing Concepts, not SWBT.

those bills was distributed in the normal course of business.

## II.

SWBT seeks judgment on the pleadings under Fed.R.Civ.P. 12(c) with respect to Brittan's claims brought pursuant to the Communications Act and the Telecommunications Act of 1996.

### A. *Legal Standard for Judgment on the Pleadings*

In reviewing a motion for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c), the Court must base its decision solely on the pleadings. *See Youngblood v. Bender*, 104 F.Supp.2d 618, 619 (E.D.La. 2000). Such a motion may be granted only if the moving party clearly establishes that no issue of material fact remains to be resolved and that it is entitled to judgment as a matter of law. *See J.M. Blythe Motor Lines Corp. v. Blalock*, 310 F.2d 77, 78 (5th Cir.1962); *Halkias v. General Dynamics Corp.*, 825 F.Supp. 123, 124 (N.D.Tex.1993), *vacated on other grounds* 56 F.3d 27 (5th Cir.1995). In reviewing a motion for judgment on the pleadings, a district court must view the facts presented in the light most favorable to, and draw all reasonable inferences in favor of, the nonmoving party. *See Youngblood*, 104 F.Supp.2d at 619; *Park Center, Inc. v. Champion International Corp.*, 804 F.Supp. 294, 301 (S.D.Ala.1992); *See also* 5A Charles Alan Wright and Arthur R. Miller, *Federal Practice and Procedure* § 1368 (2d ed.2001). By reviewing a Rule 12(c) motion in this manner, courts insure that the rights of the non-moving party are decided as if there had been a trial. *See Eristavi–Tchitcherine v. Lasser*, 164 F.2d 144, 145 (5th Cir.1947).

### B. *Brittan's Communications Act Claims*

The Communications Act, 47 U.S.C. §§ 151–613, authorizes the Federal Com-

munications Commission ("FCC") to regulate interstate and foreign telephone and radio communication. *See* 47 U.S.C. §§ 151, 152(a). Under Title II of the Communications Act, 47 U.S.C. §§ 201–224, the FCC is given explicit authority to regulate particular aspects of "communication service" by interstate and international communications common carriers. *See, e.g.,* 47 U.S.C. § 201(a) (granting the FCC authority to regulate rates charged for communication service by common carriers). Section 202(a) of Title II provides:

> It shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any means or device, or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage.

47 U.S.C. § 202(a). By its express terms, § 202(a) only applies to situations "for or in connection with" common carrier communication services.

■ Brittan alleges that SWBT's temporary suspension of billing and collection services for Brittan-generated charges submitted by Billing Concepts violated § 202(a). SWBT maintains, however, that billing and collection services are not "common carrier communication services," and thus, not subject to regulation under Title II of the Communications Act. After careful consideration of applicable FCC opinions and the relevant case law, the Court concludes that SWBT's position is correct.

In 1986, the FCC issued a decision, *In the Matter of Detariffing of Billing & Col-*

*lection Services,* 1986 WL 291513, 102 F.C.C.2d 1150 (1986), which resulted in the detariffing of billing and collection services under Title II. *See id.* at 1168. In that decision, the FCC concluded that billing and collection services performed for a long-distance company were not a "communication service," but were instead a "financial and administrative service." *Id.* As such, the FCC would not regulate billing and collection services provided by local exchange carriers under Title II of the Act. *See id.* at 1169; *see also Pub. Serv. Comm. of Md. v. FCC,* 909 F.2d 1510, 1512 (D.C.Cir.1990) ("The FCC acknowledged that it could no longer exercise jurisdiction over billing and collection services on the basis of Title II of the Act because...these services were not 'common carrier services'"); *Int'l Audiotext Network v. AT & T,* 893 F.Supp. 1207, 1223 (S.D.N.Y.1994) (noting that billing and collection services provided by local exchange carriers are not subject to regulation under Title II of the Communications Act). Although the FCC relaxed its position somewhat in a subsequent decision, stating that "[u]pon further analysis, we believe that...billing and collection is incidental to the transmission of wire communication and thus is properly considered a communications service under Section 3(a) of the Act...," the FCC did not alter its view with respect to Title II claims, reiterating that "[b]illing and collection, of course, remains outside the scope of Title II because it is not a common carrier service." *In the MATTER OF POLICIES AND RULES CONCERNING LOCAL EXCHANGE CARRIER VALIDATION AND BILLING INFORMATION FOR JOINT USE CALLING CARDS,* 1992 WL 689858, 7 F.C.C.R. 3528 n. 50 (1992).

In sum, the relevant principle that can be extracted from these FCC decisions is that billing and collection services that do not utilize communications over the common carrier's wire or radio facilities are not "communications services" regulated by Title II of the Communications Act. *See Int'l Audiotext Network,* 893 F.Supp. at 1224. Thus, Brittan has not alleged a cognizable § 202(A) claim.[5] Accordingly, SWBT's Motion for Judgment on the Pleadings is **GRANTED** with respect to Brittan's claims under § 202(a) of the Communications Act.

## C. Brittan's 1996 Telecommunications Act Claims

■ Next, Brittan alleges that SWBT violated § 251(b)(1) of the Telecommunications Act of 1996 ("the 1996 Act"), 47 U.S.C. §§ 251–53, by "imposing unreasonable or discriminatory conditions or limitations on the resale of telecommunications services." This allegation fails to support a valid cause of action, however, because the subject matter of this dispute, billing and collection services provided by a local exchange carrier, are not within the scope of the Telecommunications Act.

Congress enacted the 1996 Act to foster competition in the local telephone service market and advance the pursuit of univer-

---

**5.** In its Response to SWBT's Motion, Brittan argues that because the FCC has found other "analogous" services (e.g., the provision of billing name and address information, access to paging carriers, access to non-carrier directory assistance services) subject to regulation under Title II of the Communications Act, the FCC has retreated from its earlier position regarding billing and collection services. Although an examination of this evi-dence would possibly become relevant if the FCC had not spoken to the precise service at issue, such considerations are unnecessary here. Put another way, Brittan has failed to cite a single opinion that reverses the FCC's clear pronouncement that billing and collection services are outside the scope of Title II. Thus, Brittan's lengthy discussion of inapposite FCC decisions is irrelevant to the instant action.

sal telecommunications service in the United States. *See Alenco Communications, Inc. v. FCC,* 201 F.3d 608, 614, 625 (5th Cir.2000). Under the Act, local exchange carriers are subject to a host of duties intended to facilitate market entry, foremost among which is local exchange carrier's duty to share its network with competitors. *See AT & T Corp. v. Iowa Utilities Bd.,* 525 U.S. 366, 371, 119 S.Ct. 721, 142 L.Ed.2d 835 ( 1999). Section 251(b)(1), applicable to incumbent local exchange carriers, imposes "the duty not to prohibit, and not to impose unreasonable or discriminatory conditions or limitations on, the resale of telecommunications services." 47 U.S.C. § 251(b)(1).

Brittan fails to allege a viable § 251(b)(1) cause of action, however, because Brittan, as a switchless reseller of long-distance service (as opposed to a carrier seeking entry to the local telephone service market), never attempted to purchase telecommunications services from SWBT. This lawsuit revolves instead around the provision of billing and collection services by an incumbent local exchange carrier—not the resale of telecommunications services by an incumbent local exchange carrier.[6] Therefore, § 251 is wholly inapplicable to the facts of this case.[7] Accordingly, SWBT's Motion for Judgment on the Pleadings is **GRANTED** with respect to Brittan's Telecommunications Act claims.

### III.

Next, SWBT seeks Summary Judgment on Brittan's DTPA, fraud, tortious inter-

ference with contractual relations and tortious interference with business relations claims.

### A. *Legal Standard for Summary Judgment*

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). When one party moves for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Issues of material fact are "genuine" only if they require resolution by a trier of fact. *See id.* at 248, 106 S.Ct. at 2510. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. Only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgment. *See id.* at 247–48, 106 S.Ct. at 2510. Nevertheless, if the evidence is such that a reasonable factfinder could find in favor of the nonmoving party, summary judgment should not be granted. *See id.; see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89

---

**6.** The 1996 Act defines "telecommunications service" as "the offering of telecommunications for a fee directly to the public." 47 U.S.C. § 153(46). "Telecommunications" is defined as "the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information sent and received." 47 U.S.C. § 153(43). Clearly,

the billing and collection services at issue here do not fall within this definition.

**7.** Furthermore, Brittan abandoned its § 251 claim when it failed to adduce evidence on the issue in response to SWBT's Motion for Judgment on the Pleadings. *See Dupre v. Harris Co. Hosp. Dist.,* 8 F.Supp.2d 908, 925 (S.D.Tex.1998).

L.Ed.2d 538 (1986); *Dixon v. State Farm Fire & Cas. Co.*, 799 F.Supp. 691 (S.D.Tex. 1992) (noting that summary judgment is inappropriate if the evidence could lead to different factual findings and conclusions). Determining credibility, weighing evidence, and drawing reasonable inferences are left to the trier of fact. *See Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513.

## B. *Brittan's Fraud Claims*

■ To prevail on its fraud claim, Brittan must prove that: (1) SWBT made a material representation that was false; (2) it knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth; (3) it intended to induce Brittan to act upon the representation; and (4) Brittan actually and justifiably relied upon the representation and thereby suffered injury. *See Union Pacific Res. Group, Inc. v. Rhone Poulenc, Inc.,* 247 F.3d 574, 586 (5th Cir.2001) (citing *Formosa Plastics Corp. v. Presidio Engineers and Contractors,* 960 S.W.2d 41, 47 (Tex.1998)); *Ernst & Young v. Pacific Mut. Life Ins. Co.,* 51 S.W.3d 573, 577 (Tex.2001).

Brittan advances two theories in support of its fraud claim. First, Brittan contends that it suffered harm because Billing Concepts, "likely in reliance" on SWBT's alleged representation in a November 2, 1998 letter stating that it might not suspend acceptance of Brittan's billing, did not convey to Brittan the totality of what the letter expressly stated-that SWBT would suspend acceptance of Brittan's billing absent a sufficient and timely response from Billing Concepts. According to Brittan, SWBT intended to remove Brittan from its billing tables no matter what response it received from Billing Concepts. Thus, because SWBT allegedly concealed its true intent from Billing Concepts, Brittan continued to operate in the normal course of business, unaware that its billing was going to be terminated, and as a result, incurred large financial losses.

■ In essence, Brittan claims that because it was uninformed about the entire contents of the letter from SWBT to Billing Concepts, Brittan continued to operate and incur costs. This fraud theory is fatally flawed, however, because it is grounded on an alleged misrepresentation of which Brittan claims it was never aware. Even if SWBT misrepresented its intent to consider Brittan's response regarding the potential suspension of Brittan's billing, Brittan specifically states that the alleged misrepresentation was made to Billing Concepts, not Brittan itself. Therefore, based upon its own admissions, Brittan did not rely upon this alleged misrepresentation. *See Ernst & Young,* 51 S.W.3d at 577 (explaining that a fraud claim requires the plaintiff to prove that he actually and *justifiably* relied upon the representation).

Next, Brittan argues that it was harmed when SWBT misrepresented the time it would take to re-establish billing services for Brittan. Specifically, Brittan claims that Dick Oxler, on behalf of SWBT, indicated during a November 1998 conference call between Brittan, SWBT and Billing Concepts personnel that billing services would "promptly be restored" as soon as Billing Concepts made the decision to forward Brittan's billing. Brittan maintains that it relied on this alleged statement in making business decisions, maintaining overhead, and most of all, allowing its customers to continue to use long-distance service at its expense. According to Brittan, the twenty-one days that elapsed before SWBT restored Brittan to its billing tables after receiving the go-ahead from Billing Concepts are evidence that SWBT did not act "promptly."

■ This fraud theory also fails to support a valid cause of action. In his deposition, Jim Edwards, president of Brittan, stated that at the end of the conference call, the decision as to whether Billing Concepts would ever resume submitting Brittan-generated charges to SWBT was left entirely up to Billing Concepts. Therefore, a real possibility existed that Billing Concepts would never resume its submission of Brittan-generated charges to SWBT for billing and collection. Because Brittan was aware that Billing Concepts may not have ever agreed to resume its submission of Brittan's charges to SWBT, Brittan cannot prove that it *justifiably* acted upon the alleged misstatement by SWBT. *See id.*

In sum, the summary judgment evidence clearly supports a finding that both theories advanced by Brittan in support of its fraud claim fail, as a matter of law, to support a valid cause of action for fraud under Texas law. Accordingly, SWBT's Motion for Summary Judgment is **GRANTED** with respect to Brittan's fraud claim.

## C. *Brittan's DTPA Claims*

SWBT seeks Judgment on the Pleadings, or, in the alternative, Summary Judgment, with respect to Brittan's DTPA claims. In addition to the pleadings submitted by both parties, the Court examined evidence submitted by both parties, i.e., deposition testimony and affidavits, while considering Brittan's allegations brought under the DTPA. As such, the Court will treat SWBT's Motion as a Motion for Summary Judgment, rather than a Motion for Judgment on the Pleadings, as to Brittan's DTPA claims.

■ The DTPA prohibits "[f]alse, misleading or deceptive acts or practices in the conduct of any trade or commerce..." Tex. Bus. & Com.Code § 17.46(a). To re-

cover from SWBT under the DTPA, Brittan must establish: (1) it was a consumer of SWBT's goods or services; (2) SWBT committed false, misleading or deceptive acts in connection with the lease or sale of goods or services; and (3) such acts were a producing cause of actual damages to Brittan. *See Brown v. Bank of Galveston, N.A.*, 963 S.W.2d 511, 513 (Tex.1998).

Brittan alleges that SWBT violated two DTPA laundry list provisions, Tex.Bus. & Com.Code §§ 17.46(b)(5) and (7), by: (1) representing that its goods or services had sponsorship, approval, characteristics, ingredients, uses, benefits or quantities which they did not have; and (2) representing that its goods or services were a particular standard, quality or grade, or that goods were a particular style or model, when they were another. Furthermore, Brittan alleges that SWBT violated § 17.45(5) of the DTPA by acting unconscionably in suspending Brittan's billing services. Specifically, Brittan contends SWBT took advantage of Brittan's lack of ability to bill its customers in any economically efficient way without SWBT's service.

■ The Texas Supreme Court has found that a defendant's deceptive trade act or practice is not actionable under the DTPA unless it was committed in connection with the plaintiff's transaction in goods and services. *See Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 650 (Tex. 1996). The "in-connection-with" requirement imposes a limitation of liability consistent with the underlying purposes of the DTPA, i.e., to protect consumers in consumer transactions. *See id.* at 649–50.

The *Amstadt* case involved DTPA claims by homeowners against manufacturers of, and suppliers of raw material used in the manufacture of, polybutelene plumbing systems. *See id.* at 650. At issue was whether the Texas Legislature intended

that upstream suppliers of raw materials and component parts be liable under the DTPA when none of their misrepresentations reached consumers. *See id.* at 647. The court determined that because the upstream manufacturers and suppliers never marketed or promoted their product to the homeowners, any representations made with regard to the product were not made "in connection with" the relevant consumer transactions, i.e., the purchase of homes. *See id.* at 650–52. The court's analysis applies with equal force to allegations based on misrepresentations and unconscionable acts. *See id.* at 652.

In *Dagley v. Haag Eng'g Co.*, 18 S.W.3d 787 (Tex.App.-Houston [14th Dist.] 2000, no pet.), the Houston Court of Appeals applied the reasoning of *Amstadt* to a case involving DTPA claims by insured parties against an engineering firm that an insurer had hired to investigate hail damage claims. *See id.* at 789. The plaintiffs' claims were based on allegations that the engineering firm engaged in an unconscionable action or course of action and made misrepresentations that violated several DTPA laundry list provisions. *See id.* at 792 n. 5. As in *Amstadt,* none of the alleged misrepresentations reached the plaintiffs. *See id.* at 792. The engineering firm had contracted with the insurer to investigate certain hail storm damage claims and had submitted its evaluation materials, findings and opinions to the insurer, not to the plaintiffs. *See id.* As such, the court found that the plaintiffs could not satisfy the "in-connection-with" requirement of the DTPA. *Id.*

■ Although *Amstadt* and *Dagley* involved somewhat different factual situations, the underlying analysis of both decisions is pertinent to the facts of this case. As in *Amstadt* and *Dagley,* none of SWBT's alleged misrepresentations were communicated to Brittan. Brittan maintains that "all of the evidence of misrepresentations set forth…in connection with Brittan's fraud claim support a claim under the DTPA." The evidence offered in support of Brittan's fraud claim, however, is based upon alleged misrepresentations made during transactions between (1) SWBT and Billing Connections; and (2) SWBT and Brittan's long-distance customers. Put another way, the alleged misrepresentations were not made during a consumer transaction Brittan and SWBT. Therefore, the allegations forming the basis of Brittan's fraud claim fail to satisfy the "in-connection-with" requirement of the DTPA. *See Amstadt,* 919 S.W.2d at 652. Accordingly, SWBT's Motion for Summary Judgment is hereby **GRANTED** with respect to Brittan's DTPA claims brought pursuant to Tex.Bus. & Com.Code §§ 17.46(b)(5), 17.46(b)(7) and 17.45(5).

**D. *Brittan's Tortious Interference Claims***

■ Texas law protects existing and prospective contracts from interference. *Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Disc. Centers, Inc.,* 200 F.3d 307, 315 (5th Cir.2000) (citing *Juliette Fowler Homes, Inc. v. Welch Assocs., Inc.,* 793 S.W.2d 660, 665 (Tex.1990)). To maintain a cause of action for tortious interference with an existing contract, a plaintiff must demonstrate: (1) the existence of a contract subject to interference; (2) a willful and intentional act of interference; (3) the act was a proximate cause of plaintiff's damage; and (4) actual damage or loss. *See Stewart Glass,* 200 F.3d at 315; *Texas Beef Cattle Co. v. Green,* 921 S.W.2d 203, 210 (Tex.1996). Even if a plaintiff establishes the elements of this cause of action, the defendant may still prevail upon successfully establishing the affirmative defense of justification. *See Texas Beef,* 921 S.W.2d at 210.

Brittan asserts that SWBT tortiously interfered with Brittan's contractual and business relations. First, Brittan contends that when SWBT suspended its acceptance from Billing Concepts of Brittan-generated charges, SWBT tortiously interfered with the contractual relations between Billing Concepts and Brittan. Next, Brittan alleges that SWBT tortiously interfered with the business relations between Brittan and Brittan's existing long-distance customers. Brittan maintains that SWBT's suspension of billing services for Brittan-generated charges affirmatively misrepresented to Brittan's customers that although they had received long-distance service from Brittan, they owed nothing for that service. Due to this alleged misrepresentation by SWBT, Brittan's customers failed to remit payment to Brittan and consequently, Brittan suffered economic harm. Both of Brittan's tortious interference theories fail, however, because the summary judgment evidence conclusively demonstrates that SWBT was legally justified in suspending its billing for Billing Concepts of charges originating with Brittan.

In *Texas Beef,* the Texas Supreme Court noted that the justification defense is based on either the defendant's exercise of (1) its own legal rights; or (2) a good faith claim to a colorable legal right, even though that claim ultimately proves to be mistaken. *See id.* (citing *Sakowitz, Inc. v. Steck,* 669 S.W.2d 105, 107 (Tex. 1984), *overruled on other grounds by Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 (Tex.1989)). If the trial court finds that, as a matter of law, the defendant had a legal right to interfere with a contract, then the defendant has conclusively established the justification defense. *Texas Beef,* 921 S.W.2d at 210 (citing *Sakowitz,* 669 S.W.2d at 107). The motivation behind the defendant's assertion of that right is irrelevant. *See Texas Beef,* 921 S.W.2d at 210. Generally, justification is established as a matter of law when the acts the plaintiff complains of as tortious are merely the defendant's exercise of its own contractual rights. *Prudential Ins. Co. of Am. v. Fin. Review Serv., Inc.,* 29 S.W.3d 74, 81 (Tex.2000); *see also ACS Investors, Inc. v. McLaughlin,* 943 S.W.2d 426, 431 (Tex.1997); *Friendswood Dev. Co. v. McDade + Co.,* 926 S.W.2d 280, 283 (Tex. 1996); *Calvillo v. Gonzalez,* 922 S.W.2d 928, 929 (Tex.1996).

The *Calvillo* case involved claims brought by an anesthesiologist with staff privileges at a hospital against Calvillo, the chief of the anesthesiology department. *See* 922 S.W.2d at 929. The plaintiff alleged that Calvillo had tortiously interfered with plaintiff's business relations with the hospital by refusing to schedule plaintiff for anesthesiology work. *See id.* However, Calvillo's contract with the hospital gave the chief exclusive authority to operate and staff the department. *Id.* The Texas Supreme Court held that Calvillo's exclusive contract with the hospital justified, as a matter of law, Cavillo's interference with the plaintiff's prospective business relations, adding that "[g]ood faith is not a relevant factor in determining justification if the defendant acts to assert a legal right." *Id.*

Under the reasoning of *Calvillo,* SWBT's contract with Billing Concepts legally justified its interference with the business relations between Brittan and Brittan's long-distance customers, as well as its interference with the contractual relations between Brittan and Billing Concepts. First, the contract between SWBT and Billing Concepts was filed with and approved by the Public Utility Commission of Texas. As such, the contract had the force and effect of law. *See Kanuco Tech. Corp. v. Worldcom Network Serv., Inc.,*

979 S.W.2d 368, 371 (Tex.App.-Houston[14th Dist.] 1998, no pet.). Knowledge of its terms was imputed to all. *See id.* Secondly, it is undisputed that, at the time of the suspension in November 1998, SWBT was receiving a high volume of nuisance calls from customers. After a customer survey indicated that a large percentage of those calls were in reference to Brittan-generated charges, SWBT decided to protect its customers from additional cramming and slamming by suspending its billing services for charges originated by Brittan. This decision was fully in accordance with the contract between SWBT and Billing Concepts, the relevant provision of which reads: "Billing which will not be processed under the terms of this Agreement includes...[c]harges for services which, in SWBT's sole opinion, may result in nuisance calls to SWBT."

Clearly, the express terms of the SWBT–Billing Concepts contract granted SWBT complete authority to suspend billing and collection for the suspect charges generated by Brittan.[8] Therefore, this Court finds that SWBT's contract with Billing Concepts establishes, as a matter of law, SWBT's affirmative defense of legal justification. Accordingly, SWBT's Motion for Summary Judgment is **GRANTED** with respect to Brittan's claims of tortious interference with contractual relations.

**IT IS SO ORDERED**

### FINAL JUDGMENT

For the reasons set forth in the Order issued this date, Defendant's Motion for

Judgment on the Pleadings is hereby **GRANTED** and Defendant's Motion for Summary Judgment is hereby **GRANTED**. Accordingly, Plaintiff's claims against Defendant are hereby **DISMISSED WITH PREJUDICE**. All parties are **ORDERED** to bear their own costs and attorney's fees incurred herein to date. **THIS IS A FINAL JUDGMENT**.

**IT IS SO ORDERED**

---

**8.** Brittan contends that SWBT breached the SWBT–Billing Concepts contract by not giving Billing Concepts ten days notice before suspending acceptance of Brittan's bills. However, upon inspection of the contract's express terms, it is clear that the notice provision that Brittan refers to unambiguously applies *only* if SWBT or Billing Concepts chooses to terminate the *entire contract*. The contract simply does not include any notice restriction on SWBT's right to stop billing for services that SWBT believes may result in nuisance calls.